JORDAN, Circuit Judge,
concurring in part in the judgment and dissenting in part.
Not so long ago, the idea of making nuns sign government documents they believe would involve them in grievous sins relating to life and death, or forcing devout Mennonites to pay for health insurance coverage for drugs and devices they view as abortifacients, would probably have been unthinkable in this country. Then came the Patient Protection and Affordable Care Act, known variously as Obama-care, or the Affordable Care Act, or the ACA. It has trailed in its wake a number of highly contentious lawsuits but none more intensely fought than the ones in which the government has sought to sweep aside the religious objections of individuals and organizations opposed to the portion of the ACA called the “Contraceptive Mandate.” That feature of the statute, which requires non-grandfathered group health care plans to include coverage for certain controversial contraceptive items, was at the center of the aforementioned disputes involving the nuns and the Mennonites. See Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014); Little Sisters of the Poor Home for the Aged v. Burwell, 794 F.3d 1151, 1168 (10th Cir.), vacated and remanded sub nom. Zubik v. Burwell, — U.S. -, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016). And it is here for a return engagement in this case.
Having been beaten back in earlier efforts to force the Contraceptive Mandate on the populace, the government has changed its tune a bit—it has come up with a new rationale for its erratically aggressive enforcement of that feature of the ACA—but the song it sings is essentially the same: individuals whose faith prompts sincere opposition to paying for or facilitating the purchase of contraceptives cannot be heard to object; the only thing legitimately at issue is the regulation of insurance markets. According to the government, the Mandate has nothing to *367 do with deep questions about the beginning of life, or the boundaries of moral culpability, or about faith and one’s obligations to God. Religious beliefs are not being burdened in any meaningful sense, so people should just stop complaining. That is the line pressed by the United States Department of Justice, and it is the line accepted by my colleagues in the Majority, but I reject it.
Even if this case could properly be characterized as nothing more than an examination of insurance markets, though, I could not agree with my friends in the Majority on the central point of the dispute. They believe that citizens who buy health insurance are ciphers, that they do not have any “‘participation’ in the real sense of the word” when it comes to the coverage they sign up and pay for, and therefore the answer to the question “do employees really ‘play a role’ ” in the market for health care services is, according to my colleagues, a resounding no. (Maj. Op. at 359.) I disagree. After the federal government gave itself a vastly greater role in the health insurance market, there has no doubt been less room for decision making by individual purchasers. But that does not mean that people were not meaningfully participating in the market before. There were plans available that employers were free to sponsor, and employees were free to seek, that did not require payment for contraeeptive coverage. And there are still, as this record demonstrates, insurers who are ready, willing, and able to provide such plans again, if the government did not forbid it. So, while it is true that individual choice has been drastically reduced by the federal government, that subtraction of freedom cannot be a reason to say that government coercion of payment for unwanted contraceptive products—indeed, to some people, morally abhorrent products—is no burden on individuals. The circularity of the government’s and the Majority’s reasoning is stark.
I do not disagree with every aspect of my colleagues’ decision. The portion of the judgment that deals with the Equal Protection and Administrative Procedures Act claims of Real Alternatives, Inc. is sound.[1] I write separately, however, to specify my disagreements with the Majority’s treatment of the Religious Freedom Restoration Act (“RFRA”) claim brought by Real Alternatives’ employees Kevin I. Bagatta, Thomas A. Lang, and Clifford W. McKeown (the “Individual Plaintiffs”). In my view, the Individual Plaintiffs have adequately pled and provided sufficient evidence to demonstrate that the Contraceptive Mandate is a substantial burden on their free exercise of religion.[2]
Having reached that conclusion, I confront the question that the Majority *368 avoids: whether the Contraceptive Mandate is narrowly tailored to support a compelling, government interest. The answer is no. Time and again courts have rejected the regulation because it is not the least restrictive means of achieving its objective., There are several other options the government could have chosen to enforce its regulation without impinging on the rights of religiously devout individuals. For that reason, I respectfully dissent.
I. Background
The Individual Plaintiffs are full-time employees of Real Alternatives,[3] a nonprofit organization devoted solely “to promoting alternatives to abortion.” (Opening Br. at 2.) All three men, their wives-, and collectively seven minor children, are covered by Real Alternatives’ health insurance plan.
In addition to dedicating their professional lives to preventing abortion, the Individual Plaintiffs hold religious beliefs that honor life from conception. It is undisputed that all three men are devout in their respective religious faiths—Bagatta and Lang are Catholics, and McKeown is an Evangelical Christian. Among their sincerely held convictions, “[e]ach of the employees and their families believe that all human lives have full human dignity from the moment of conception/fertilization.” (JA 99.) That .is the baseline, undisputed factual background upon which we are obligated to proceed. The Individual Plaintiffs’ belief that life begins at conception entails the further belief “that they are prohibited from using, supporting, or otherwise advocating abortifacient drugs and devices, including IUD and any hormonal birth control method.... ” (JA 99.)
The Contraceptive Mandate, promulgated under the ACA, requires non-grandfathered group health care plans to include coverage for the full range of FDA-approved contraceptive methods, which encompasses diaphragms, oral • contraceptives, intrauterine devices, and drugs such as “Plan B” and “Ella.”[4] (JA 6.) The latter *369 two are sometimes called, respectively, the “morning-after pill” and the “week-after pill.” (Id.)
The Individual Plaintiffs currently elect to obtain their health insurance through their employer, Real Alternatives. Before the Mandate went into effect, Real Alternatives bought an insurance plan for its employees that did not contain contraceptive coverage. Because of the Contraceptive Mandate, that plan is no longer available. If the Individual Plaintiffs decide to decline coverage through their employer, the government requires them to obtain it in the open market, either independently or through “insurance exchanges,” which are organizations created pursuant to the ACA to facilitate the purchase of health insurance. All the plans available on the open market—again because of the Contraceptive Mandate—contain coverage for the contraceptives.[5] In other words, the government has declared that the Individual Plaintiffs must buy health insurance and, simultaneously, has made it. impossible for them to purchase any coverage that conforms to their religious beliefs.
Enforcement of the Contraceptive Mandate, however, is far from uniform. The government has granted a great many exceptions. See Conestoga Wood Specialties Corp. v. Sec’y of U.S. Dep’t of Health & Human Servs., 724 F.3d 377, 413 (3d Cir. 2013) (Jordan, J., dissenting), rev’d and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 5.Ct. 2751, 189 L.Ed.2d 675 (2014) (“By its own choice, the government has exempted an enormous number of employers from the Mandate, including ‘religious employers’ who appear to share the same religious objection as Conestoga and the Hahns, leaving tens of millions of employees and their families untouched by it.”). As the District Court observed, this scheme- of sporadic application has spawned “dozens of lawsuits ... challenging] both the Contraceptive Mandate and the dimensions of its exemptions.” (JA 11.) This is just the latest episode.
II. Discussion[6]
A. RFRA
RFRA was enacted “to provide very broad protection for religious liberty.” *370 Hobby Lobby, 134 S.Ct. at 2760. It was passed in the wake of the Supreme Court’s decision in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which upended decades of precedent by “virtually eliminating] the requirement that the government justify burdens on religious exercise.” Conestoga Wood, 724 F.3d at 407 (Jordan, J., dissenting) (quoting 42 U.S.C. § 2000bb(a)(4)). RFRA was supported by an “extraordinary ecumenical coalition in the Congressf,]” id., and has been hailed as “the most important congressional action with respect to religion since the First Congress proposed the First Amendment.” Id. (quoting Douglas Laycock & Oliver S. Thomas, Interpreting the Religious Freedom Restoration Act, 73 Tex. L. Rev. 209, 243 (1994)).[7]
Most importantly for present purposes, RFRA restored in religious liberty cases “the judicial standard of review known as ‘strict scrutiny,’ which is ‘the most demanding test known to constitutional law.’ ” Id. at 408 (quoting City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). According to RFRA, the government is generally forbidden to “substantially burden a person’s exercise of religion even if the burden results from a rule of general applicability.” 42 U.S.C. § 2000bb-1(a). If the government does substantially burden an individual’s exercise of religion, then that individual is entitled to an exemption from the government action, unless the government can show that the “application of the burden to the person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-l(b). No one disputes that the strict scrutiny required by RFRA applies to the Contraceptive Mandate, if the Mandate substantially burdens religious belief and practice.[8]
B. Substantial Burden
The Majority says that the Individual Plaintiffs have not demonstrated a substantial burden on their religious beliefs, but my colleagues reach that conclusion by a route that amounts to questioning the validity of those beliefs—an indulgence that we are forbidden. The Supreme Court has made it clear that, when applying RFRA and analyzing a burden on religion, our role is confined. “[F]ederal courts have no business addressing ,.. whether the religious belief asserted in a RFRA case is reasonable....” Hobby Lobby, 134 S.Ct. at 2778 (internal quotations omitted); cf. *371 Smith, 494 U.S. at 887, 110 S.Ct. 1595 (“Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.”); Thomas v. Review Bd. of Ind. Emp’t Sec. Div., 450 U.S. 707, 715, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (recognizing that “it is not for us to say that the line [a religious observer] drew was an unreasonable one” and that courts cannot “dissect religious beliefs”). Instead of weighing the reasonableness of deeply-held religious convictions (and inevitably passing judgment on their value), we have a “narrow function.” Hobby Lobby, 134 S.Ct. at 2779. We ask only “whether the line drawn [by the adherent] reflects an honest conviction.” Id. (citation omitted).
Once we have determined that an adherent has an honest conviction, we ask if the government regulation imposes a substantial burden on adherence to that conviction. In this instance, we must decide “whether the [Contraceptive] [M]andate imposes a substantial burden on the ability of the objecting parties to [live] in accordance with their religious beliefs[.]” Hobby Lobby, 134 S.Ct. at 2778. A “substantial burden” exists where: (1) “a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [persons] versus abandoning one of the precepts of his religion in order to receive a benefit”; or (2) “the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.” Washington v. Klem, 497 F.3d 272, 280 (3d Cir. 2007).
The Individual Plaintiffs attest in their Verified Complaint that paying for insurance coverage for contraception violates their religious beliefs.[9] See Verified Complaint at ¶ 46 (JA 99-100) (“[T]he Real Alternatives employees and their families object, on the basis of their sincerely held ethical and religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members.”). Because of the Contraceptive Mandate, they are faced with two choices: purchase a plan with the offending coverage (either through their employer or on the exchanges) or decline to purchase a plan, face a tax penalty, and leave their families uninsured. See 26 U.S.C. § 5000A (codifying the ACA’s individual mandate which requires individuals without employer-coverage to purchase insurance or pay a penalty). Notwithstanding the Majority’s protestations to the contrary, that is a prime example of a substantial burden on religion. It manages to satisfy both of the alternative tests for a substantial burden: a believer is forced to choose whether to follow the precepts of his religion and be penalized by the government, or to abandon his convictions,[10] and the “government [thus] puts substantial pressure on [the follower] to substantially modify his behavior and to violate his beliefs.” Washington, 497 F.3d at 280.
The Supreme Court has long since declared that a Hobson’s choice like the one *372 forced upon the Individual Plaintiffs is indeed a substantial burden on the exercise of religion. See Thomas, 450 U.S. at 716, 101 S.Ct. 1425 (“More tha[n] 30 years ago, the Court held that a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program.”). And that principle remains in full force today. See Trinity Lutheran Church of Columbia, Inc. v. Comer, — U.S. -, 137 S.Ct. 2012, 2021-22, 198 L.Ed.2d 551 (2017) (finding a burden on religion under the Free Exercise clause where a state statute required a church to choose between “participat[ing] in an otherwise available benefit program or re-mainpng] a religious institution”). It reflects an understanding that predates RFRA but rings throughout the statute. See Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (finding a burden on a plaintiff where a staté unemployment law “force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand”); Wisconsin v. Yoder, 406 U.S. 205, 218, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (finding a substantial burden where a “Wisconsin [compulsory education] law affirmatively compel[led] [the plaintiffs] under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs”). The avoidance of such dilemmas is a key purpose of RFRA. See 42 U.S.C. § 2000bb(b) (stating that a purpose of RFRA is “to provide a claim or defense to persons whose religious exercise is substantially burdened by [the] government”).
Hobby Lobby considered. in depth whether the Contraceptive Mandate imposed a substantial burden on religiously devout persons who were being forced to make a choice very like the one at issue here.[11] 134 S.Ct. at 2775-77. In that case, “family-run businesses” whose owners had strongly-held religious beliefs against contraception were forced to face severe economic fines if they chose to honor them beliefs.[12] Id. The Supreme Court reasoned that “[b]ecause the Contraceptive Mandate forces them to pay an enormous sum of-money ... if they insist on providing insurance coverage in accordance with their religious beliefs, the [M]andate clearly imposes a substantial burden on those beliefs.” [13] Id. at 2779.
*373 Two other courts have considered the precise question before us today: whether the Mandate imposes a substantial burden on the exercise of religious beliefs when individuals are required to purchase insurance coverage through their employer or on the open market, and all available plans (because of government action) are required to contain coverage at odds with those individuals’ faith. Both courts held that the Contraceptive Mandate does, in that context, impose a substantial burden on the exercise of religion. In March for Life v. Burwell, 128 F.Supp.3d 116, 130 (D.D.C. 2015), the court said “[ejmployee plaintiffs are ... caught between the proverbial rock and a hard place: they can either buy into and participate in a health insurance plan that includes the coverage they find objectionable and thereby violate their religious beliefs, or they can forgo health insurance, altogether- and thereby subject themselvés to penalties for violating the ACA’s individual mandate.” Similarly, in Wieland v. United States Department of Health & Human Services, 196 F.Supp.3d 1010, 1017 (E.D. Mo. 2016), the court observed that the Mandate’s “ultimate impact is that Plaintiffs must either maintain a health insurance plan that includes contraceptive coverage, in violation of their sincerely-held religious beliefs, or they can forgo healthcare altogether, which will result in the .imposition of significant penalties (not to mention the potentially crippling costs of uninsured health care).”
The Majority here, though, sees things differently. It claims that the Contraceptive Mandate cannot possibly impose a substantial burden on anyone, relying on six general arguments to bolster that conclusion. Those reasons, however, look like nothing more than a rejection of where the individual Plaintiffs’ consciences have led them to draw the line against being complicit in what their religions tell them is wrong. It is the legitimacy of their conscientious religious objections that my colleagues call into question, contrary to the explicit direction of the Supreme Court. See Hobby Lobby, 134 S.Ct. at 2778 (refusing to delve into “difficult and important questions] of religion and moral philosophy”). ' ,
1. The Precedential Effect of Geneva College
First, the Majority relies on the now-vacated decision of our court in Geneva College v. Secretary, United States Department of Health & Human Services, 778 F.3d 422 (3d Cir. 2015), vacated and remanded sub nom. Zubik v. Burwell, — U.S. -, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016), to emphasize that courts can, and should, ássess the substantiality of a claimant’s asserted burden. In that case, a panel considered the religious exemption to the Mandate and determined that requiring nonprofit religious employers to register their .objection to the Contraceptive Mandate by filling out a form was not a substantial burden under RFRA. See id. at 442 (“Because we find that-the self-certification procedure does not cause of trigger the provision of contraceptive coverage, appellees are unable to show that their religious exercise is burdened.”). That opinion was deprived of any precedential effect by the Supreme Court’s decision in Zubik v. Burwell, 136 S.Ct. at 1561. Nevertheless, the Majority contends that Geneva is persuasive and was not vacated because it was incorrect. (Maj. Op. at 356 n.18.) I have my doubts about Geneva’s reasoning,[14] but no doubt that it is not controlling,[15]
*374 But even if Geneva were binding or persuasive precedent, it does not lead to the result the Majority reaches in this case. There are significant factual differences between the burdens alleged in Geneva and those at issue here. Notably, the panel in Geneva reasoned that the claimed burden—the requirement to fill out and file a form—was actually a means to register and affirm the employer’s objection to providing contraceptive coverage. See Geneva, 778 F.3d at 438-39 (“If anything, because the appellees specifically state on the self-certification form that they object on religious grounds to providing such coverage, it is a declaration that they will not be complicit in providing coverage.”). According to Geneva, filling out the form was, in effect, the organization’s chance to “wash[] its hands of any involvement in contraceptive coverage[,]” leaving it to “the insurer and the third party administrator [to] tak[e] up the slack under compulsion of federal law.” Id. at 441 (internal quotation omitted).[16] Here, the Individual *375 Plaintiffs are compelled to do much more than fill out and file a form. Far from distancing themselves from the objectionable coverage, the Individual Plaintiffs are forced to sign up and pay for it, unless they want themselves and their families to be uninsured and to pay fines. They must actually provide financial support for the objectionable contraceptive coverage, just like the plaintiffs in Hobby Lobby. The Majority does nothing to address that distinction between Geneva and this case.
2. Using, Supporting, or Advocating the Use of Contraceptives
The Majority next turns to the words of the Individual Plaintiffs’ Complaint, where they object to “using, supporting, or otherwise advocating, the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families.” (Verified Compl. ¶ 158.)[17] The Majority first claims that signing up for an insurance plan that covers contraceptive coverage does not involve the “use, support, or advocacy of contraceptives” because “[cjhecking off a box to be eligible for reimbursement of services ... of the employee’s choosing ... in no way indicates, let alone suggests, support or advocacy for that service.” (Maj. Op. at 359.) That conclusion relies on the Majority’s perception of how insurance coverage works:
The plan deems the employee eligible to be reimbursed for hundreds of different services, and that employee can take advantage of that eligibility as he or she sees fit. Should the employee opt to use a particular service, he or she fills out a form and asks to be paid back for costs incurred. In the end, the employee uses a covered service, or not; either way, there is no requirement to support or advocate for whatever service he or she, or others, selects.

(Id.)

As my colleagues see it, because the Individual Plaintiffs can elect not to use the covered contraceptives, they are not burdened by having to pay for the coverage. The message is “get over it.” And that seems to me to be only a “thinly-veiled attack” on sincerely-held religious beliefs. March for Life, 128 F.Supp.3d at 129. When the Individual Plaintiffs say in their Verified Complaint that it is at odds with their religious beliefs to purchase a plan which uses their money to offer products and services they believe to be morally abhorrent, I think we are supposed to believe them.
And we should, because their concern that their money will be used to support contraceptives is perfectly logical. It is the Majority’s ’ characterization of how the insurance market functions that is confused. It overlooks two essential truths: money is fungible and insurance is based on the *376 pooling of risk. Cf. Nat'l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. 519, 132 S.Ct. 2566, 2585, 183 L.Ed.2d 450 (2012) (The requirement that everyone must purchase health insurance “forces into the insurance risk pool more healthy individuals, whose premiums on average will be higher than their health care expenses. This allows insurers to subsidize the costs of covering the unhealthy individuals the [ACA] reforms require them to accept.”). In the government’s own words, the system “works through ‘risk pooling in the group market’ which ‘results in sharing .., costs ... across an entire plan or employee group.’ ” (Responding Br. at 23-24 (quoting 75 Fed. Reg. at 41,730).) Thus even when the individual Plaintiffs elect not to use contraceptive coverage, they still pay for and thus , support it. See id. at 24 (noting that the plans “cover a wide array of services ... [and insurers] set rates based on standardized policies [that] ensure[] that medical costs are spread across the entire pool of plan beneficiaries”). It is peculiar, then, for the Majority to claim that purchasing an insurance plan that includes contraception “does not assure the availability of specific services.” (Maj. Op. at 360.) While an individual must seek out and use a particular service, the point of health insurance is in fact to help facilitate and support access to each service for everyone'in the risk pool.
Taken to its logical conclusion, my colleagues’ position means that the Contraceptive Mandate could only be a “substantial burden” on the exercise of religion if the government forced religious objectors not only to buy plans with contraceptive coverage, but also to buy the covered contraceptives. That .idea was rejected by the Supreme Court in Hobby Lobby, when it determined that providing coverage to employees, who may or may not elect to use the contraceptive coverage, was a substantial burden on the exercise of religion.[18] See Hobby Lobby, 134 S.Ct. at 2778 (“The Hahns and Greens believe that providing the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage.”). The Majority here may prefer the position taken by the dissent in Hobby Lobby, see 134 S.Ct. at 2799 (Ginsburg, J., dissenting) (“I would conclude that the connection between the families’ religious objections and the contraceptive coverage requirement is too attenuated to rank as substantial. The requirement carries no command that Hobby Lobby or Conestoga purchase or provide the contraceptives they find objectionable.”), but that was the losing argument, as it should have been.
3. Participating in a Plan Containing Contraceptives
The Majority next focuses its attention on the Individual Plaintiffs’ claim that participating in a health insurance plan containing coverage for contraceptives is a substantial burden on their free exercise. In doing so, my colleagues reduce the Individual Plaintiffs to non-entities in the calculus of harm. The Majority’s argument is that the Individual Plaintiffs do not mean *377 ingfully “participate” in the.acquisition of their health insurance coverage, so the market regulation forcing all but exempt plans to carry contraceptive coverage cannot be a substantial burden on them. There is, however, no sound legal or logical foundation for that position.
To begin, the Majority claims that there is no “active ‘participation’ ” by an individual in subscribing to an insurance plan. (Maj. Op. at 359.) Their argument is that the concepts of “buy into” and “participate in” are not “interchangeable[,]” therefore when individuals purchase an insurance plan, they do not participate in it. (Id.) This is a semantic distinction without difference. And even assuming that the “active” participation requirement had a basis in our case law (which it does not), being an insurance plan participant should fit the bill. “[Hjealth insurance does not exist independently of the people who purchase it,” March for Life, 128 F.Supp.3d at 129, and the purchasers are not designated by the insurers as “plan participants” for nothing. As already explained, the Individual Plaintiffs are not simply paying for the services they elect to use; they are participants in a plan that pools risk and provides comprehensive coverage. They are paying for all services, even those they individually decline to use, thus their participation in the plan directly subsidizes the use of contraceptives. That is hardly “remote facilitation.” (Maj. Op. at 361) (citation omitted). What’s more, the Majority completely ignores that “participation” in the insurance market is compelled—and enforced with a significant monetary penalty.[19] Being required to associate with and subsidize an organization or activity that one disagrees with does indeed impose a substantial burden on religion.
The Majority also makes a nearly identical argument using' a slightly different term-directness. But, deploying a synonym does not improve the argument that the Individual Plaintiffs can be ignored as playing no “active ‘role’” in them health plans. (Maj. Op. at 360.) Even if the Individual Plaintiffs’ burden or participation could rightly be characterized as “indirect” in some way, nothing requires a burden to be “direct” to be cognizable under RFRA. See Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 450, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (“It is true that this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.”).[20]
*378 My colleagues also draw a number of analogies in an effort to demonstrate why this case does not involve a substantial burden. None ring true. They hypothesize someone alleging a substantial burden when subscribing to a magazine, or joining an organization, or acquiring a credit card. According to the Majority, “there is no active ‘participation’ ” in any of these scenarios because “[tjhese are all packages that involve a one-time enrollment, followed by essentially passive eligibility for certain services that the member opts in or out of.” (Maj. Op. at 359.) My colleagues again completely ignore that purchasing health insurance in the era of the ACA is far from voluntary—it is compelled and enforced with a monetary fine. Their examples are therefore meaningless. Of course subscribing to a magazine would be a substantial burden under RFRA if it were abhorrent to the subscriber’s religious beliefs and were forced upon him by the government.[21] The same is true for compelled membership in an organization.
The credit card and banking analogy fares no better. My colleagues say that, as in the'insurance market, “accountholders [at a bank] have no say in lending decisions (what rates to charge, which borrowers to lend to) and no direct control over the bank.” (Maj. Op. at 360 n.25.) Accordingly, if we were to “[a]ssume that the individual’s bank account is mandated by the Government under a privatized Social Security regime” and “an accountholder had a religious objection to the bank’s practices” such as “lending money at interest[,]” that accountholder could not “successfully vindicate his or her religious beliefs through RFRA.” (Id.) I disagree. In that hypothetical, it would undoubtedly impose a substantial burden on religion to force such believers to put their money into an interest bearing account contrary to their religious beliefs.[22] The consequence of determining that there was a substantial burden would not be to prevent the government from instituting a privatized Social Security regime. The consequence would be to force the government to satisfy strict scrutiny before forcing the religious objector to participate.[23] See *379 United States v. Lee, 455 U.S. 252, 260-61, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (analyzing whether Social Security satisfied strict scrutiny with respect to an Amish objector).
In the end, the Majority’s claim that the Individual Employees do not meaningfully participate in their health care plans cannot be saved by the hypotheticals on which they rely. Each ignores that the government has coerced the Individual Plaintiffs to purchase health insurance with provisions deeply offensive to their sincerely held religious beliefs. The hypotheticals thus serve only to underscore the weakness of the Majority’s argument.
4. “Incidental” Effects and Lyng
To bolster its arguments regarding “direct” and “active” participation, the Majority tries to link this case and Geneva to Lyng v. Northwest Indian Cemetery Protective Association. In that ease the Supreme Court concluded that the government’s building of a road on public land used for religious purposes by Native Americans was not a violation of their right to Free Exercise. 485 U.S. at 447-53, 108 S.Ct. 1319. My colleagues also make passing reference (Maj. Op. at 347) to Bowen v. Roy, 476 U.S. 693, 699-700, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), a Supreme Court case relied upon in Lyng which held that requiring the use of social security numbers to participate in federal food stamp and aid programs was not a significant burden on religious beliefs. See Bowen, 476 U.S. at 699-700, 106 S.Ct. 2147.
Bowen and Lyng are distinguishable. Both cases recognized the difference between challenges to “certain forms of governmental compulsion” and policies that amounted to the “Government’s internal procedures.” Bowen, 476 U.S. at 700, 106 S.Ct. 2147. In Bowen, because.the assignment of a social security number did not require the religious objectors to do anything, the Court found that the law fell into the latter category. Id. (recognizing that religious protections under the Free Exercise clause’ extend to “what the government cannot do to the individual, not in terms of what the individual can extract from the government”) (quotation omitted). And in Lyng, the same was true: the claimants sought to stop government action that affected their religious practice (i.e. building a road through their lands), but did not compel their own behavior. Lyng, 485 U.S. at 449, 108 S.Ct. 1319 (“In *380 both cases, the challenged Government action would interfere significantly with private persons’ ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government’s action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.”). By contrast, the ACA forces the Individual Plaintiffs to engage in certain behavior—purchasing health insurance—and enforces that compulsion with the threat of a significant fine.
My colleagues, however, fixate on the Supreme Court’s observation in Lyng that an incidental effect of a government program with “no tendency to coerce individuals into acting contrary to their religious beliefs” is not violative of the First Amendment. (Maj. Op. at 361 ¿,29.) (quoting Lyng, 486 U.S. at 450-51, 108 S.Ct. 1319). Of course, I do not disagree with that limitation. But the Majority is fighting a losing battle with common sense when it argues that imposing financial penalties on individuals who fail to take action that violates their religion has “no tendency to coerce.” The Mandate coerces the Individual Plaintiffs into violating their beliefs by forcing them to purchase a health care plan at odds with their religious convictions. See Verified Complaint at ¶ 46 (JA 99-100) (“[T]he Real Alternatives employees and their families object, on the basis of their sincerely held .., religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members.”). Thus, the Individual Plaintiffs here are not challenging the way the government “conduces] its own internal affairs,” (Maj. Op. at 357 (quoting Bowen, 476 U.S. at 699, 106 S.Ct. 2147)); they are challenging what a government regulation requires them to do.[24] As the Supreme Court’s recent holding in Trinity Lutheran demonstrates, laws that coerce religious claimants to disavow their religion in order to receive a government benefits are inconsistent with our constitutional traditions. Cf. Trinity Lutheran, 137 S.Ct. at 2022 (finding “express discrimination” un *381 der the First Amendment where a church was denied the opportunity to compete for a government benefit “solely because it is a church).[25]
The Majority also dresses up the “incidental” point in different language and says that RFRA bars claims arising out of burdens on third parties. The faulty logic is that, because the Contraceptive Mandate only regulates the insurer and not the Individual Plaintiffs, it cannot be a substantial burden under RFRA. See (Maj. Op. at 364 (“The Supreme Court has consistently rejected the argument that an independent obligation on a third party can impose a substantial burden on the exercise of religion in violation of RFRA.” (quoting Geneva, 778 F.3d at 440-41))). But the Individual Plaintiffs do not object to insurance companies offering plans with contraceptive coverage, making the cases the Majority relies on about third parties irrelevant. The Individual Plaintiffs are only asking the government to allow them to purchase a plan that does not include the offending coverage—a request that, according to this record, would not impose any harm or burden on any third parties. There evidently are insurers prepared to fill that market demand, just as there were before the ACA told all insurers that they had to eliminate thát choice.
' 5. Opening the Floodgates.
The Majority also relies on a floodgates argument to hold that the Individual Plaintiffs have not experienced a substantial burden on . their free exercise of religion. My colleagues worry that allowing the Individual Plaintiffs to maintain a RFRA claim would open the way to myriad challenges to the ACA, because “the categories of services that could offend religious beliefs [are] wide-ranging.” (Maj. Op. at 363.) Thus, “denying -... such services to all on the basis of the religious- objections of some would be neither- desirable nor ad-ministrable.” Id.
Of course, that fails to address the burden issue at all. It is merely an assertion that, regardless of the burden on religious belief, it could be difficult for the.government to do what it wants if any accommodation for religious believers must, be made. Sadly, this argument is “the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I’ll have to make one for everybody, so no exceptions.” Gozales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 436, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006). It is also the reasoning of the dissent in Hobby Lobby, which worried that allowing a RFRA challenge to one part of the ACA “would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind.” 134 S.Ct. at 2785 (quoting Smith, 494 U.S. at 888-89, 110 S.Ct. 1595). But the Majority in Hobby Lobby rightly rejected that hyperbolic concern, recognizing that the judiciary is bound to apply the balancing test set forth by RFRA to adju *382 dicate such claims. See id. (“But Congress, in enacting RFRA, took the position that ‘the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.’ ” (quoting 42 U.S.C. § 2000bb(a)(5))). The command “to enforce RFRA as written[,]” id., requires us to avoid imagining a speculative “parade of horribles” as a counterweight to the real burden on real people. March for Life, 128 F.Supp.3d at 132; see also Gonzales, 546 U.S. at 434, 126 S.Ct. 1211 (“RFRA, however, plainly contemplates that courts would recognize exceptions—that is how the law works.” (citing 42 U.S.C. § 2000bb-1(c))).[26]
Nevertheless, because the Majority has cited concern for the insurance markets as a reason to walk away from RFRA, it bears emphasis that there is a simple answer to that concern.[27] It was given by Judge Richard Leon of the United States District Court for the District of Columbia in his thoughtful rebuttal of the “parade of horribles” argument in the March for Life case. He demonstrated that the Majority’s argument has no real weight because “[i]n-surance companies have every incentive to maintain a sustainable and functioning market....”[28] 128 F.Supp.3d at 132. Thus, *383 “the government’s interest in the same would not be undermined by simply making it legal for a third-party provider to offer, without penalty, a plan consistent with [Individual] [PJlaintiffs’ religious beliefs.” Id. In the event that “offering an insurance plan that does not include a service or services to which a potential purchaser objects on religious grounds would be ‘an impossible administrative undertaking,’ insurance companies will not do it.”[29] Id. When we leave to the insurance companies themselves the decision of what coverage options they can profitably provide, it is obvious that the “parade of horribles” will not begin to march. See id. The market managed to provide coverage options before the ACA and it is a good bet it can do so again.
6. “Substantial” Burden
My colleagues repeatedly highlight that government action must substantially burden religion in order to be cognizable under RFRA, citing Geneva and legislative history as proof that the weight of the burden is “the very essence of a RFRA claim[.]” (Maj. Op. at 358.) They say that, even if there is a burden on the Individual Plaintiffs, it is not enough to be considered “substantial.” That is the comfortable rationale. “No matter how sincerely held [the Individual Plaintiffs’] beliefs may be, we cannot accept at face value that subscribing to the plan imposes a ‘substantial burden.’” (Id. at 365.) In articulating that conclusion, my colleagues recognize that their characterization is “a matter of subjectivity,” as indeed it is. Id. at 365.
They are,' of course, correct that the plain language of RFRA forbids the government from “substantially burden[ing]” a claimant’s exercise of religion. 42 U.S.C. § 2000bb-1(a); Cf. Paek v. Attorney Gen. of the U.S., 793 F.3d 330, 334 (3d Cir. 2015) (“[W]e do not resort to legislative history to cloud a statutory text that is clear.” (quoting Ratzlaf v. United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994))). But as I have already endeavored to show, the compelled action here is indeed a substantial burden. It seems to me that the disagreement we have in this case is not fundamentally about the burden; it is about the underlying belief.
The Majority claims that I have made the misstep of “conflat[ing]” the duty to analyze whether a burden is substantial with our obligation to accept the validity of a claimant’s religious belief. (Maj. Op. at 358 n.24.) But, I have addressed the two questions distinctly, see supra at 371 (“Once we have determined that an adherent has an honest conviction, we ask if the *384 government regulation imposes a substantial. burden on adherence to that conviction.”)» knowing that caution is needed because an, evaluation of the substantiality of a burden, can easily cross into the forbidden territory of opining on .the merits of a claimant’s beliefs. See Hobby Lobby, 134 S.Ct. at 2777-78 (recognizing that focusing on the closeness of “connection between what the objecting parties must do ... and the end they find to be morally wrong” in reality “dodges the, question that RFRA presents ... and instead addresses a very different question that the federal courts have no business addressing”).
It is the .Majority’s approach that runs afoul of binding precedent,[30] and my colleagues’ rejection of the deference we owe to the Individual Plaintiffs’ convictions is at odds with the respect that has historically governed our approach to expressions of religious belief. “The religious views espoused by respondents might seem incredible” to some people, “[b]ut if those doctrines are subject to trial .,, [to determine] their truth or falsity, then the same can be done with the religious, beliefs of any sect.” United States v. Ballard, 322 U.S. 78, 87, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). When ¡judges wade into those waters, “they enter a forbidden domain,” Id.; see also James Madison, Memorial and Remonstrance against Religious Assessments, Papers 8:298—304 (June 20, 1785) (critiquing the notion that a civil judge can be “a competent Judge of Religious Truth”). My friends in the Majority do not simply wade in; they dive in with gusto, commenting that their analysis allows them to “enumerate[ ] [each] allegation in turn,' and ... conclude that the Real Alternatives Employees have failed to demonstrate that the Contraceptive Mandate forces them to violate their religious beliefs.” (Maj. Op. at 359.)
I sincerely wish that this were not the Majority’s analytical approach. In a powerful dissent from the denial of en banc review in the Little Sisters of the Poor case, Judge Harris Hartz of the Tenth Circuit pointed out how fraught with ill-consequences it can be.[31] Calling it a “dan *385 gerous approach to religious liberty,” Judge Hartz asked whether our country could “really tolerate letting courts examine the reasoning behind a religious practice or belief and decide what is core and what is derivative?” Little Sisters, 799 F.3d at 1317 (Hartz, J., dissenting). He used two examples to demonstrate the serious problems raised by a what’s-the-big-deal approach. First, it could require a Christian “to work on December 25 because, according to a court, his core belief is that he should not work on the anniversary of the birth of Jesus but a, history of the calendar and.other sources show that Jesus was actually born in March.” Id. Next, he said it would allow the government to provide a Jewish prisoner with “only non-kosher food because the real purpose of biblical dietary laws is health, so as long as the pork is well-cooked, etc., the prisoner’s religious beliefs are not substantially burdened.” Id. at 1317-18. Such reasoning is “contrary to all precedent concerning the free exercise of religion.” Id. at 1318.
I agree with Judge Hartz and decline to question the Individual Plaintiffs’ religious beliefs under the guise of adjudicating “substantial burden.”. I respect their convictions and conclude that the Contraceptive Mandate—which forces them, under threat of monetary penalty, to sign up for and participate in a system that violates their devoutly held beliefs about human life—is a substantial burden on their exercise of religion.
C. Strict Scrutiny
Because the Individual Plaintiffs are “substantially burdened”- by the Contraceptive Mandate, I turn to the “strict scrutiny” questions the Majority does not address: whether the government action is “in furtherance of a compelling government interest” and is the “least restrictive means” of achieving that interest. See 42 U.S.C. § 2000bb-l(b), That standard is “exceptionally demanding,” Hobby Lobby, 134 S.Ct. at 2780, and the government’s arguments are inadequate. Along with many others who have considered the matter, I do not believe that the Contraceptive Mandate can survive strict scrutiny.[32] See id. (“HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion- by the objecting parties in these cases.”); March for Life, 128 F.Supp,3d at 131 (“The final question the Court must ask under RFRA is whether the current Mandate is thé least restrictive means of serving this governmental interest. Assuredly, it is not!”); Wieland, 196 F.Supp.3d at 1019 (holding that the “government has not met its burden” to satisfy RFRA). I consider in turn both the interest initially advanced by the government—access to contraception—and the government’s newly discovered interest—a universal health care system.
1. Access to Contraception
In Hobby Lobby, the majority opinion assumed without deciding that one interest *386 proffered by the government was compelling: “ensuring that all women have access to all FDA-approved contraceptives without cost sharing.” 134 S.Ct. at 2779. If, that is a given, the question becomes whether the Mandate is the least restrictive means of furthering that compelling government interest. The test is sometimes framed as an inquiry into whether the means is “precisely tailored” to meet the compelling interest. Id. at 2783; see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531-32, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (recognizing in the Free Exercise context that a burden on religion “must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest”). The Hobby Lobby Court concluded that there were several other options available to the government to meet that interest, the most straightforward of which would be for “the government to assume the cost of providing the contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers’ religious objections.” 134 S.Ct. at 2780. Here, the government could surely do the same thing, defraying the cost of contraceptive coverage to the extent necessary to make up for the absence of people in the insurance pool who decline the coverage.[33] If allowing some people to opt out of the Mandate ended up costing any significant amount, the government—whose interest it is—could absorb the cost. See id. at 2781 (“RFRA ... may in some circumstances require the government to expend additional funds to accommodate citizens’ religious beliefs.”).
In Hobby Lobby, the Supreme Court observed that the government had “already established an accommodation for nonprofit organizations with religious objections[,]” id. at 2782, and the very existence of that accommodation proved that less restrictive means could be used to reach the government’s ends. See id. (considering that the accommodation would “not impinge on the plaintiffs’ religious belief ... and it serves HHS’s stated interests equally well”). The same is true here. The government briefly argues that an accommodation cannot be possible for individual buyers of insurance, saying that exemptions to the Mandate “apply only to employers ... not individuals.” See (Gov. Br. at 29 (quoting District Court Opinion, JA 76)). But the government does not justify why employers deserve an accommodation and individuals do not. Indeed, the argument is quite an about-face from the position the government took in Hobby Lobby and Conestoga Wood, when it contended loudly that only individuals' could have religious scruples and the companies who employed them could not. Hobby Lobby, 134 S.Ct. at 2774 (“HHS contends that Congress could not have wanted RFRA to apply to for-profit corporations because it is difficult as a practical matter to ascertain the sincere ‘beliefs’ of a corporation.”); Conestoga Wood, 724 F.3d at 403 (Jordan, J., dissenting) (noting the irony in the idea “religious belief takes shape within the minds and hearts of individuals” while denying religious liberty to “an entity that is nothing more than the common vision of five individuals from one family who are of one heart and mind about their religious belief’). The Individual Plaintiffs have proposed a number of ways the government could satisfy its interest in providing contraceptive coverage.[34]
*387 Parties to the Zubik litigation also suggested ways that access to contraceptives could be provided without trampling on religious beliefs. See Zubik v. Burwell, Supp. Reply Brief For Petitioners, 2016 WL 1593773 at *1 (filed April 20, 2016) (“The government concedes ,.. that its existing regulatory scheme ‘could be modified’ to eliminate the self-certification requirement for petitioners with insured plans without sacrificing its professed objective of ‘ensuring that the affected women receive contraceptive coverage seamlessly.’ ”) (quoting Respondent’s Supp. Br. at 14-15). The Petitioners in Zubik outlined a solution in which “the insurance company [could be made to] make available to plan beneficiaries a separate plan providing the excluded contraceptive coverage” and separately “contact beneficiaries to inform them of that plan and how to enroll.” See Zubik, Supp. Br. for Petitioners, 2016 WL 1445914 at *4 (filed April 12, 2016). The distinct plans would be akin to dental or vision insurance that are “truly” independent of general health insurance and have a separate enrollment process, insurance card, and payment source. Id. at *1. That same option could be provided to individuals purchasing health care on the open market.
The wisdom of those options may be debated, but not their existence, so the government’s decision to simply refuse to engage in the discussion is telling. It appears that the government “has open to it [several] less drastic way[s] of satisfying its legitimate interest ]” and has made “no showing that any of the [Individual Plaintiffs’] alternative ideas would be unworkable.” See Conestoga Wood, 724 F.3d at 414-15 (Jordan, J., dissenting) (citations omitted). Thus, the government’s position cannot withstand strict scrutiny.
2. A Uniform Health Care System
Evidently recognizing that it cannot win if its interest is described as providing contraceptive coverage, the government actually abandons that position and declares it to be “irrelevant,” (Responding Br. at 27), which is remarkable given how intensely it insisted that that interest was compelling before. Nevermind. It has a new set of interests now. In its words, “a compelling interest in the provision of health care and the functioning of the insurance market ... [and] a corresponding ‘interest in the uniformity of the health care system the ACA puts in place, under which all eligible citizens receive the same minimum level of coverage’ ” are the only rationales we should consider. (Responding Br. at 25 (quoting Priests for Life v. U.S. Department of Health & Human Services, 772 F.3d 229, 265 (D.C.Cir. 2014)).)[35]
These sweeping claims fly in the face of the Supreme Court’s command in Hobby Lobby that compelling government interests must be precisely defined. The Court there rejected the government’s attempt to assert interests that were “couched in very broad terms, such as promoting ‘public health’ and ‘gender equality.’ ” Hobby Lobby, 134 S.Ct. at 2779. Instead, it said, judges are “to loo[k] beyond broadly formulated interests and to scrutinize^] the *388 asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in .enforcing the Contraceptive Mandate in these cases.” Id. (alterations in original) (quotations omitted). A generalized interest in health care and insurance is too abstract to be compelling in a legal sense when addressing the Individual Plaintiffs’ request for relief.
No more compelling is the government’s claimed interest in uniformity of the Mandate’s application. That claim cannot be given credence because millions of people have already been excepted. “The Mandate is a classic ... example of ... arbitrary underinclusiveness.” Conestoga Wood, 724 F.3d at 414-15 (Jordan, J., dissenting). As the Supreme Court observed, “[a]ll told, the Contraceptive Mandate presently does not apply to tens of millions of people.” Hobby Lobby, 134 S.Ct. at 2764 (internal quotation- and citation omitted). “A .law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.” Conestoga Wood, 724 F.3d at 413 (Jordan, J., dissenting) (quoting Church of Lukumi Babalu, 508 U.S. at 547, 113 S.Ct. 2217).[36] The government cannot persuasively declare that it has an interest in universality and uniformness—only to,- at the same time, make the means decidedly not universal and uniform. Because of this incongruity, the claimed interest cannot credibly be characterized as compelling.[37]
Charitably assuming that the government’s interest is better understood as a functioning and comprehensive insurance *389 market, the Mandate is again not the least restrictive means of achieving that interest. The government points to United States v. Lee, 455 U.S. at 257-258, 102 S.Ct. 1051, to say a universal system can be the least restrictive means to achieve a compelling interest. True enough, But in Lee, the Supreme Court was considering taxation to provide a “comprehensive national social security system.” Id. at 258, 102 S.Ct. 1051. As Judge Leon pointed out in March for Life, there is a “critical distinction” between that scheme and the ACA:
Unlike in Lee, the government does not provide the insurance at issue here, and there is no single “comprehensive national [health insurance] system.” See Lee, 455 U.S. at 258, 102 S.Ct. 1051. Instead, the government regulates a host of third party insurers. The Mandate burdens employee plaintiffs’ religious exercise by restricting the form in which those third parties can offer something that plaintiffs, for all intents and purposes, must buy.
March for Life, 128 F.Supp.3d at 131-32.
Understood from that perspective, there is an obvious solution to further the government’s interest: refrain from penalizing insurers who offer plans in accordance with the Individual Plaintiffs’ beliefs. Id. at 132 (“The government need not require an insurer offer such a plan at plaintiffs’ request in order to avoid burdening plaintiffs’ religious exercise.”). Because insurance companies would offer such plans as a result of market forces, doing so would not undermine the government’s interest in a “sustainable and functioning market.” Id. And that remedy would also necessarily be limited in scope; it would not “enable [insurance companies] to refuse to provide [contraceptive] coverage to others who do not share those, religious objections.” Id. Because the government has failed to demonstrate why allowing such a system (not unlike the- one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny. ■
III. Conclusion
To the Majority, this is all much ado about nothing: the burden of signing forms and paying money in support of drugs, devices, and procedures that affect the well springs; of human life is so slight it cannot be called substantial, so the Individual Plaintiffs should simply sign and pay and. stop complaining. What my colleagues fail to appreciate is that coercing financial support for something deeply objectionable is a real and substantial burden, and a forced signature alone can be problematic. In matters of conscience, the signing of one’s name is moré than a scrawl on paper. Robert Bolt gave these compelling words to Sir (and Saint) Thomas More in the play “A Man for All Seasons”: “When a man takes an oath, ... he’s holding his own self in his hands. Like water. And if he opens his fingers then— he needn’t hope to find h'imself again.”
The Individual Plaintiffs do not want to lose themselves. They have demonstrated the seriousness of the burdens forced upon them by the Contraceptive Mandate. Under RFRA, it thus became incumbent on the government to show that its actions are narrowly tailored to achieve a compelling purpose. In my estimation, the government has failed to meet that ’exacting standard. I thus respectfully dissent and concur only in the judgment as to Real Alternatives, not in the judgment against the Individual Plaintiffs.

. I do not agree in full with the reasoning the Majority employs for the APA claim, see infra footnote 4, but I do agree that precedent requires the result.

. In the District Court, the government asked either for dismissal or summary judgment. The District Court accepted and perpetuated that ambivalence, granting the government’s motion to dismiss or in the alternative for summary judgment. The Majority Opinion treats the District Court opinion as solely granting summary judgment to the government. As I see it, the government does not win either way; it loses either way. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.’ ”) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.”). The Individual Plaintiffs’ RFRA claim should survive.

. Bagatta serves as the President of Real Alternatives, Lang is the Vice President of Operations, and McKeown is the Vice President of Administration.[1]

. Grandfathered plans are defined as those that existed prior to March 23, 2010. See Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2764, 189 L.Ed.2d 675 (2014) (citing 42 U.S.C. §§ 18011(a), (e)). They "need not comply with many of the [ACA’s] requirements, including the [C]ontra-ceptive [M]andate.” Id, As I indicated in dissent in Conestoga Wood Specialties Corp. v. Secretary of United States Department of Health & Human Services, 724 F.3d 377 (3d Cir, 2013) (Jordan, J., dissenting), rev’d and remanded sub nom, Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), the Mandate and related regulations were "not the product of any legislative debate” or "even the result of work within an administrative agency.” Id, at 391 n.2, They were drafted by the Institute of Medicine, a private entity that, as a result of the ACA’s complicated scheme "has ended up dictating regulations that the government insists override[] the [Individual Plaintiffs'] rights to religious liberty.” Id.
The Majority takes issue with whether the products and services covered by the Contraceptive Mandate include abortifacients, See (Maj. Op, at 346). While we may be bound to accept the Department of Health and Human Services’ definition of "abortifacients” for purposes of APA review, see Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (holding—not without controversy—that courts must defer to an agency’s interpretation of its own ambiguous regulation so long as it is not “plainly erroneous or inconsistent with the regulation” (citation omitted)), that is not true when we are considering the burden imposed on the Individual Plaintiffs’ exercise of their religious beliefs. The Individual Plaintiffs are persuaded that life begins at conception and that, by definition, a drug or device that prevents implantation of a fertilized ovum is an abortifacient. In other litigation, the government has admitted that some items covered by the Contraceptive *369 Mandate can indeed prevent implantation. Brief of Respondent United States in Opposition to Cert., Conestoga Wood Specialties Corp. v. Sebelius, 2013 WL 5740267 at *10 n.5 (filed October 21, 2013) ("Plan B, an emergency contraceptive, is a pill that works mainly, by stopping the release of an egg from the ovary but may also work by preventing fertilization of an egg or by preventing attachment (implantation) to the womb (uterus).... Ella, another emergency contraceptive, is a pill that works mainly by stopping or delaying the ovaries from releasing an egg but may also work by changing the lining of the womb (uterus) that may prevent attachment (implantation).” (quotations and citation omitted)).

. According to the Verified Complaint, all available plans "will include all contraceptives, including abortifacients, and might also include surgical abortion.” (JA 1.14.)

. As stated in the Majority Opinion, the District Court had jurisdiction and so do we. See (Maj. Op. at 346 n.5), The. government conceded at oral argument that the Individual Plaintiffs have standing to challenge the Mandate. See http://www2.ca3.uscourts.gov/ oralargumeni/audio/16-1275RealAltematives Inc.etalv.SecretaryDeptofHealthandHuman Services,etal.mp3, at 22:32 (argued November 3, 2016) (counsel for the government recognizing that there "probably was standing”). I agree. But for the Mandate, the Individual Plaintiffs would be able to purchase a . health plan that does not include the contraceptives to which they object. Cf. March for Life v. Burwell, 128 F.Supp.3d 116, 123 n.6 (D.D.C. 2015) ("At the request of the Court, plaintiffs submitted a letter received from March for Life's insurance carrier, CareFirst BlueCross BlueShield. The letter states that CareFirst would be willing to offer March for Life or its employees a plan omitting the *370 contraceptive coverage that they are objecting to [i]f a legal exemption from [the Mandate] is obtained.” (alteration in original) (citation omitted)). The Majority acknowledges this when they state that ”[t]he existence of an alternative plan is ... relevant to standing[.]” (Maj. Op. at 365 n.36.)

. The Majority focuses its telling of this history on Smith's rejection of a test that allowed broad protection for religious liberty. See (Maj. Op. at 355 (quoting Smith, 494 U.S. at 888, 110 S.Ct. 1595 for the proposition that a balancing test "would open the prospect of constitutionally required religion exemptions from civic obligations of almost every conceivable kind”)). That misses the key point that RFRA was passed for the very purpose of overruling Smith to the fullest extent of Congress’s power. See 42 U.S.C. § 2000bb(b) (declaring that the purpose of RFRA was “to restore the compelling interest test” from pre-Smith jurisprudence).

. RFRA as passed by Congress also applied to the States, but, in City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that the attempt to apply the statute to the States exceeded Congress’s power under Section Five of the Fourteenth Amendment. See Hobby Lobby, 134 S.Ct. at 2761 (discussing City of Boerne, 521 U.S. at 533-34, 117 S.Ct. 2157.)

. A Verified Complaint is treated as an affidavit in the summary judgment posture. See, e.g., Reese v. Sparks, 760 F.2d 64, 67 (3d Cir. 1985) (treating a verified complaint as an affidavit for purposes of summary judgment).

. Supreme Court jurisprudence demonstrates that the imposition of a government penalty is at least as onerous as the withholding of a government benefit. See Hobby Lobby, 134 S.Ct. at 2775 (noting that it had "little trouble concluding” that forcing plaintiffs to choose between honoring their religious convictions or facing severe economic penalties was a substantial burden).

. The Majority asserts that my sáying' the decisions faced by the employers in Hobby Lobby and the employees here are similar "misstates the applicability of Hobby Lobby[.]’’ (Maj. Op. at 355 n.17.) Not so. The comparison is apt because the claimants in Hobby Lobby and the Individual Plaintiffs in this case were both forced by the United States to take nearly-identical action: purchase of and participation in a plan that covers a form of contraception that they believe is antithetical to the sanctity of life.

. The Supreme Court also rejected an argument made by the government that the plaintiffs could avoid the substantial burden by simply declining to provide health insurance to their employees. See Hobby Lobby, 134 S.Ct. at 2777 (“We doubt that the Congress that enacted RFRA—or, for that matter, ACA—would have believed it a tolerable result to put family-run businesses to the choice of violating their sincerely held religious beliefs or making all of their employees lose their existing healthcare plans.”). Here, the burden is likewise substantial because the Individual Plaintiffs' only alternative to purchasing the offending insurance plans is to forego insurance and pay the associated penalty,

.The immediate financial cost to the employees is less here, but not insignificant. See 26 U.S.C. § 5000A (imposing a penalty of the higher of either 2’,5% of household income or $695/adult and $347.50/child, the latter capped at $2,085). Of course, that cost does not account for the very serious risk that must .be absorbed if one is forced to go without health insurance.

. The opinion in Geneva reflects, I think, an admirable effort to explain why the form-filling exercise should not give the faithful concern that they are complicit in actions *374 contrary to their religion. But there is a different and persuasive discussion in the dissent from the order denying rehearing en banc review in the Tenth Circuit in Little Sisters of the Poor Home for the Aged v. Burwell, 799 F.3d 1315, 1317 (10th Cir. 2015) (Hartz, J., dissenting) (“When a law demands that a person do something the person considers sinful, and the penalty for refusal is a large financial penalty, then the law imposes a substantial burden on that person’s free exercise of religion. All the plaintiffs in this case sincerely believe that they will be violating God’s law if they execute the documents required by the government. And the penalty for refusal to execute the documents may be in the millions of dollars. How can it be any clearer that the law substantially burdens the plaintiffs’ free exercise of religion?”).

. In claiming that I mischaracterize their argument, my colleagues agree that Geneva is not controlling and lacks precedential force. (Maj. Op. at 356 n.18.) ("Geneva is no longer controlling^]”). But the Majority claims that "Zubik vacated our judgment in Geneva but did not attack the reasoning” and suggests that the Supreme Court’s vacatur has no impact on "the view of our Court” as set forth in that case. (Id.) It is inaccurate to claim that a vacatur has no effect on the strength of an opinion—indeed, we have repeatedly emphasized in our case law that, when an opinion is vacated, "it carries no precedential force.” 1621 Route 22 W. Operating Co., LLC v. Nat’l Labor Relations Bd., 825 F.3d 128, 141 n.6 (3d Cir. 2016); see also Leader v. Apex Hosiery Co., 108 F.2d 71, 81 (3d Cir. 1939) (holding that a decree considered to be vacated "is no longer binding as a precedent, as the law of the case, or as res judicata”). Other Circuits are in general agreement on this point. See, e.g., Durning v. Citibank, N.A., 950 F.2d 1419, 1424 (9th Cir. 1991) (rejecting an argument that a decision still had precedential value because it was vacated on alternative grounds because while "[a] decision may be reversed on other grounds ... a decision that has been vacated has no precedential authority whatsoever”). The Majority cites no case law for the extraordinary proposition that an appellate court’s reasoning and judgment, after it has been vacated by the Supreme Court, should carry weight in future cases, especially when applied to litigants who were not parties to the original dispute,
Geneva's holding was vacated after the Supreme Court received supplemental briefing indicating that the government and non-profit religious employers could, potentially reach a compromise position that did not infringe on the rights of the latter. See Zubik, 136 S.Ct. at 1560 ("Given the gravity of the dispute and the substantial clarification and refinement in the positions of the parties, the parties on remand should be afforded an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners’ health plans 'receive full and equal coverage, including contraceptive coverage.' ” (citation omitted)). Thus, the Supreme Court did not in any way endorse the conclusion that the college did not face a substantial burden under RFRA. See id. ("[T]he Court does not decide whether petitioners’ religious exercise has been substantially burdened.... ”)

. The response to that reasoning, of course, is that saying something does not make it so. *375 If the government says "file this paperwork so that we can give abortifacients to your employees,” it may not help to add "and don’t worry, you will not be complicit in what's going to happen as soon as you file that paperwork.”

. The Majority ignores this statement of the Individual Plaintiffs in their Verified Complaint defining their burden: “the Real Alternatives employees and their families object, on the basis of their sincerely held ethical and religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members.” See Verified Complaint at ¶ 46. That particular iteration of the burden focuses on the financial aspect of paying into a plan that supports contraceptive services. The Majority has completely ignored the financial consequences of the Mandate, so it is perhaps not surprising that they have chosen to attend solely to a portion of the Complaint that does not mention those consequences.

. The Majority makes an artificial distinction and says that while the Contraceptive Mandate "requires nothing of the employees that implicates their religious beliefs” the Mandate did affect the employers in Hobby Lobby because it “literally required” them to " 'arrange for’ contraceptive coverage in a way that effectively amounted to sponsorship.” (Maj. Op. at 362 (quoting Hobby Lobby, 134 S.Ct. at 2775)). That purported difference is meaningless—in both Hobby Lobby and here the claimants were forced to financially support others' use of contraceptives, an action that was antithetical to their religious beliefs. As in Hobby Lobby, "it is not for us to say [whether] the[ ] religious beliefs are mistaken or insubstantial,” 134 S.Ct. at 2778.

. By ignoring the fact that the Individual Plaintiffs are forced to buy health insurance, the Majority attempts to make the central question whether or not a health insurance purchaser meaningfully "participates” in their insurance plan. But that is not the question RFRA asks. The proper inquiry is whether government action substantially burdens religion. Where the "participation” is abhorrent to the claimants’ religion—and it is compelled—it should be plain that their religious exercise is substantially burdened.

. The Majority chides me for not including a fuller quotation in the parenthetical to this citation to Lyng v. Northwest Indian Cemetery Protective Association, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). (Maj. Op. at 361 n.29.) But the Supreme Court itself, in Trinity Lutheran Church of Columbia, Inc. v. Comer, recently relied on Lyng for that precise principle, noting that "the Free Exercise clause protects against ‘indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.’ ” — U.S. -, 137 S.Ct. 2012, 2022, 198 L.Ed.2d 551 (2017) (quoting Lyng, 485 U.S. at 450, 108 S.Ct. 1319).
Also, according to my colleagues, the March for Life opinion that they spend so much time belittling actually supports them on the significance of "direct vs. indirect” burdens. But in the quotation the Majority borrows, the March for Life opinion simply acknowledged the fact that the Contraceptive Mandate regulated, insurers in the first instance. See March *378 for Life, 128 F.Supp.3d at 129 (noting that individuals are not "the direct objects” of the .Contraceptive Mandate). That does not mean that purchasers are unaffected. In reality, the labels "direct" and "indirect” are too malleable to be of any real use in this context. By regulating the types of plans insurance companies can offer, and then forcing individuals to purchase those plans, the government is, in a very real sense, directly acting on individuals. Moreover, the Majority has ignored the rest of the discussion in March for Life, which lays out why the Mandate is a substantial burden. See id. ("While it is true that an asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious adherent ... health insurance does not exist independently of the people who purchase it." (internal citations and quotations omitted)).

.Jefferson was right: "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.” Abood v. Detroit Bd. of Ed., 431 U.S. 209, 235 n.31, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (quoting I. Brant, James Madison: The Nationalist 354 (1948)).

. Those who desire to follow prohibitions on usury in the Torah and Quran often avoid traditional banldng or enter into alternative arrangements with banks. See, e.g., Naureen S. Malik, Interest-Free Financing for U.S. Muslims, ABC News http://abcnews.go.com/ Business/story?id=87070 (explaining that there are two relevant Islamic prohibitions, “[o]ne against the use of ribaa or ribit, also known as usury; and the other against gharar, the unbundled sale of risk, such as gambling, insurance or derivatives[,]" and noting that banks will offer alternative arrangements to comply with those prohibitions).

. The Majority's analogies are troubling not only under RFRA, but also under the Constitution. See W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 *379 L.Ed. 1628 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens tó confess by word or act their faith therein.”). The proposals suggested by the Majority would violate the First Amendment in more ways than one. In the association context, the Supreme Court has repeatedly found that being forced to subsidize and affiliate with an organization one disagrees with clearly burdens freedom of association and expression, even when the cost of membership is de minimis and there is no additional requirement to participate. See, e.g., Harris v. Quinn, — U.S. —, 134 S.Ct. 2618, 2639, 189 L.Ed. 2d 620 (2014) (striking down compelled labor union membership require-mente); Keller v. State Bar of California, 496 U.S. 1, 6, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) (finding mandatory bar dues that were used for ideological or political educational programs violated the First Amendment). Likewise, free speech protections prevent the government from compelling an individual to subsidize or facilitate expression of speech that one disagrees with. See, e.g., Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (holding that the government cannot require a newspaper to provide space for the expression of certain viewpoints); Pac. Gas & Elep. Co. v. Pub. Utilities Comm'n of California, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (rejecting a law that forced a power company to allow public interest groups to share a message on its billing envelopes).

. The Majority’s collection of out-of-Circuit cases.is also not persuasive. I will.spare the reader an extensive response to each and every one of the cases cited by the Majority in its lengthy footnote 33. Broadly speaking, however, the cases cited are simply inapplicable or distinguishable. For instance, some of the cases involve situations where the government offered an accommodation for .religious belief. See, e.g., United States v. Friday, 525 F.3d 938, 947-48 (10th Cir. 2008) (upholding a law creating a general prohibition on hunting bald eagles but allowing. Native Americans to apply for a permit if they need to hunt for religious reasons); Berman v. Bd. of Elections, 420 F.2d 684, 685-86 (2d Cir. 1969) (concluding a case was moot where the municipality permitted an individual to vote in another polling place when voting in a Church violated his religious beliefs). Others recognized that claimants could exercise their religion, without government penalty, in closely analogous circumstances that did not impose a burden. See, e.g., Henderson v. Kennedy, 253 F.3d 12, 17 (D.C. Cir. 2001) (upholding a law preventing sale of t-shirts on the National Mall against a RFRA challenge , because the religious individuals seeking to sell their shirts on the ^/Iall had not shown why selling on .the Mall rather than a few blocks away was required by their religious beliefs); Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc., v. City of Lakewood, 699 F.2d 303, 307-08 (6th Cir. 1983) (upholding a zoning ordinance that limited locations where churches could be built where there was no suggestion that building in the approved zone would impose a prohibitive cost or interfere with the religious mission of the Church). Most fundamentally, none of these cases involved challenges to government action that forced individuals to act contrary to their religious beliefs under threat of government fine.

. The Majority says that Trinity Lutheran is not relevant because it is "not a RFRA case[.]” (Maj. Op. at 361 n. 29.) But First Amendment cases based on the Free Exercise clause certainly are relevant to understanding the meaning and application of RFRA, See Hobby Lobby, 134 S.Ct. at 2778-79 (relying on pre-RFRA cases to analyze a substantial burden under RFRA); (Maj. Op. at 362 (relying on Lyng, a pre-RFRA case)). And whether the Supreme Court was "[sjignaling its intent to confine its holding” (Maj. Op. at 361 n.29) in Trinity Lutheran with a footnote is far from clear. See Trinity Lutheran, 137 S.Ct. at 2026 (Gorsuch, J., concurring) (voicing concern that courts would "mistakenly read” that footnote to narrow the scope of the court's holding and pointing out that doing so was "unreasonable” because cases are "governed by general principles, rather than ad hoc' improvisations.” (citation omitted)).

. The Majority criticizes my reliance on Gonzales because that opinion does not address the Majority’s "concerns regarding the end-run on legislation” that would be "unleash[ed]” by adjudicating the Individual Plaintiffs’ RFRA claim. (Maj. Op. at 365 n.34.) But courts are bound to adjudicate the substantial burden inquiry under RFRA based on the facts before them. Cf. Morrow v. Balaski, 719 F.3d 160, 201 (3d Cir. 2013), as amended (June 14, 2013) (Fuentes, J., dissenting) (”[W]e ought not refuse to grant relief that is warranted simply to stem future litigation.”). And Gonzales did address an argument that the "effectiveness” of the regulation at issue would be "necessarily undercut” by granting an exception. 546 U.S. at 434, 126 S.Ct. 1211. The Court rejected that speculation. See id. at 435, 126 S.Ct. 1211 (finding that there was "no evidence” that allowing a RFRA exemption for claimants would "undercut the Government’s ability to enforce” the law with respect to non-claimants).

. My colleagues claim that the existence of an alternative plan is only relevant to "standing and questions of redressability” (Maj. Op. at 365 n.36), and yet they emphasize concerns about the workability of the insurance market in their substantial burden analysis. See (Id. at 364 (worrying that “a finding that coverage for one set of objectionable services constitutes a substantial burden would imply that coverage for all such services imposes a substantial burden—an implication that would render the health care system totally unworkable” (citations and internal quotation marks omitted))). As ought to be clear from their own concerns, the likely availability of alternative insurance plans is relevant to the merits aspects of the case.

.My colleagues try to rebut this point by dragging a red herring across the trail: they argue that my position means I am hostile to all regulation. See (Maj. Op. at 365 n.35) (characterizing my position as concluding that “any regulation of any market is unnecessary”). Even if that were true, and it most assuredly is not, it is irrelevant to the discussion. To be clear, I am not arguing that all regulation is devoid of value. I am simply stating that, if we conclude that individual religious adherents are substantially burdened by the regulation, granting them an exemption will not take down the system. The fact that they will have to find an insurer—one which is subject to market forces—to provide them with their desired plan demonstrates that their request will not unravel the system. If it did present that threat, no insurer would offer such a plan. And we know that at least one insurer is likely to offer such a plan. See March for Life, 128 F.Supp,3d at 123 n.6 (recognizing that an insurer was willing to offer a contraception-free plan). What’s more, we know that, before the ACA forbade markets to respond to consumer demand, many insurers offered such plans and the United States managed to have a functioning health insurance market.
The seatbelt analogy the Majority offers is passing strange but must, I suppose, have an *383 answer. First, automobile regulations recognize safety concerns for the public generally— who knows who will ride in a vehicle; it could be any number of people, and protecting them has been deemed wise, so the government did not wait for market forces to work. That safety concern is unlike anything related to the Contraceptive Mandate and the insurance market. Strangers do not get in and out of your policy as they can get in and out of your car. Moreover, if one were to imagine an anti-seatbelt religious sect (a thought exercise which seems to demean the religious concerns actually at issue in this case), there is no warrant for fearing that, if the government permitted members of that sect to buy a car without seatbelts or to remove the belts after buying the car, the U.S. automobile industry would cease to function.

. The Majority argues that I am operating on a false premise because “[insurance companies have an interest in a sustainable and functioning insurance market only to the extent that it is profitable for them.” (Maj. Op. at 365.) But that is exactly my premise and it is not false. Long-term profits are only realizable in a sustainable and functioning market. If the cost of providing plans with carve-outs for conscience threatens the viability of the insurance market, such plans will not be offered, and they will not be offered precisely because insurance companies are motivated by profit.

. In support of its interpretation of the sub-stantiality requirement, the Majority repeatedly cites to the dissenting opinion in Hobby Lobby, see (Maj. Op, at 355; 362 n.30), as well as secondary sources arguing against the majority opinion in Hobby Lobby, see, e.g., Frederick Mark Gedicks, "Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA, 85 Geo. Wash. L. Rev. 94, 101 (2017) (lauding the dissent in Hobby Lobby for '‘questioning]'' what it characterizes as "a doctrinal regime that renders RFRÁ’s substantial burden element functionally nonjusticiable”); Matthew A. Melone, Corporations and Religious Freedom: Hobby Lobby Stores—A Missed Opportunity to Reconcile a Flawed Law with a Flawed Health Care System, 48 Ind. L. Rev. 461, 503 (2015) (taking the position that "an imposition on conscience" that arises from the Mandate "is not a burden on exercise at all"). Those writings may make for interesting reading but they are not the law, no matter how earnestly the Majority wishes they were. Legal academics are free to disregard Supreme Court precedent, but we are not. On many difficult issues, including this one, there are law review articles with varying perspectives, compare Gedicks, supra, with Scott W. Gaylord, RFRA Rights Revisited: Substantial Burdens, Judicial Competence, and the Religious Nonprofit Cases, 81 Mo. L. Rev. 655 (2016) (arguing that Hobby Lobby precludes courts .from considering the weight of the burden imposed on religious claimants), but that intellectual variety does not mean courts can adopt the reasoning they find most appealing, rather than abiding by controlling Supreme Court precedent. We are required to follow Hobby Lobby, and I am pleased to do so since its reasoning is entirely persuasive.

. The Majority criticizes my reliance on the dissenting opinion in Little Sisters. I cite it as persuasive, not binding, authority. And I note that the majority opinion in Little Sisters was vacated by the Supreme Court in Zubik v. *385 Burwell, — U.S. —, 136 S.Ct, 1557, 194 L.Ed.2d 696 (2016). Moreover, my colleagues in the Majority are not consistent in their rejection of dissenting opinions. See (Maj. Op. at 360 (favorably describing the dissent in Hobby Lobby)).

. The Majority avoids this step in the analysis by holding that the Individual Plaintiffs are not substantially burdened by the Mandate. My colleagues claim that I am wrong to recognize that the Mandate has not survived strict scrutiny, on repeated occasions because only two courts have “addressed the precise question before us today.” (Maj. Op. at 366 n.37.) It is true that only two courts have faced the identical dilemma, see supra p. 372, but I am confident that the outcomes in the avalanche of related litigation the Mandate has spawned are relevant, see, e.g., Hobby Lobby, 134 S.Ct. at 2779-81, and that is what I have referred to.

. It is not clear that the government would need to step in at all, since the number of people wanting to avoid such coverage is unknown.

. The government could include religiously-objecting families in "existing federal family planning programs” that provide coverage for free or reduced rates: provide objecting fami *387 lies with “federal subsidies” to offset the cost of the coverage; or require the government to pay insurance companies directly for the added cost of contraceptive coverage. See (Opening Br. at 54-55).

. There is more than a whiff of gamesmanship about the government’s newly claimed compelling interest. In a strict scrutiny analysis, we ordinarily reject “post hoc rationalizations" for government action and instead rely on the "basis [for the regulation] articulated by the agency itself.” See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

. In addition to the variety of exemptions from the employer mandate discussed in Hobby Lobby, 134 S.Ct. at 2764, there are also a wide variety of exemptions from the individual mandate. Significantly, there is an exemption for those who have membership in a religious sect that objects to insurance. 26 U.S.C. § 5000A(d)(2)(A), Additionally, individuals who participate in a previously-existing "health care sharing ministry” are exempted from the . Mandate. 26 U.S.C. § 5000A(d)(2)(B) (defining a health care sharing ministry as a tax-exempt organization of members who "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs” that has existed since December 31, 1999), Those additional exemptions further underscore the Mandate’s underinclu-siveness,

, The United States Court of Appeals for the District of Columbia Circuit in Priests For Life v. United States Department of Health & Human Services, 772 F.3d 229 (D.C. Cir. 2014), vacated and remanded sub nom. Zubik v. Burwell, — U.S. -, 136 S.Ct. 1557, 194 L.Ed.2d 696 (2016), accepted a number of government interests as compelling, including "a sustainable system of taxes and subsidies under the ACA to advance public health.” Ld. at 258. In considering the Mandate's further-anee of that interest, the court concluded that "[t]he government's interest in a comprehensive, broadly available system is not undercut by the other exemptions in the ACA, such as the exemptions for religious employers, small employers, and grandfathered plans.” Id. at 266.
That holding is not binding on us and, in any event, is an assertion rather than a reasoned conclusion, The scope of the exceptions here is far more significant than the "narrow category" exempted from Social Security in United States v. Lee, 455 U.S. 252, 261, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). See Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1143 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014) ("[T]he interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people.”). I am persuaded that the number of "congressional exemptions” to the Mandate demonstrate that the ACA does "not preclude exceptions altogether” and "RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.” Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 421, 434, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006).